FRITZ SILBERMAN and FLORENCE SILBERMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Silberman v. Commissioner
Docket No. 2820-70.
United States Tax Court
T.C. Memo 1973-48; 1973 Tax Ct. Memo LEXIS 240; 32 T.C.M. (CCH) 212; T.C.M. (RIA) 73048; February 26, 1973, Filed *240 The petitioner contributed the cost of playground fencing, four parcels of residential property, and a tract of unimproved industrial property to charitable organizations. Held, the fair market value of such property is determined. Urban C. Bergbauer, Jr., for the petitioners. Charles M. Lock, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The respondent determined deficiencies in the petitioners' Federal income tax of $123.18 for 1966 and $8,014.20 for 1967. The only issues to be 2 decided *241 concern the value of certain property contributed by the petitioners to charitable organizations in 1966. FINDINGS OF FACT Some of the facts were stipulated, and those facts are so found.
The petitioners, Fritz and Florence Silberman, are husband and wife. At the time the petition was filed in this case, they maintained their legal residence in East St. Louis, Illinois. They filed their joint Federal income tax returns for the years 1966 and 1967 with the district director of internal revenue, Springfield, Illinois. Fritz Silberman will sometimes be referred to as the petitioner. The petitioner was a realtor in East St. Louis, purchasing and selling real estate for his own portfolio. His practice was to purchase property at bargain prices from people in need of cash.As a result, most of his property was purchased through trust companies, attorneys, and the probate court in East St. Louis. He had engaged in this practice for more than 35 years, and by the time of trial, had accumulated over 500 pieces of property, of which at least 70 percent were obtained in probate proceedings. 3 In 1966, the petitioner made numerous contributions of both cash and property to *242 charitable organizations described in section 170(c) of the Internal Revenue Code of 1954. [1] Each parcel of real property was located in East St. Louis. In 1966, the petitioner agreed to pay for the cost of erecting a fence around a playground belonging to the Episcopal Diocese, Springfield, Illinois, and located on the corner of 8th and Ohio in East St. Louis, Illinois. The petitioner never owned the fence; the diocese arranged for its purchase and installation. The retail price for the fence was $932. However, because it was purchased by a church, the seller allowed a discount of $200. Thus, the petitioner paid only $732 for the fence. The petitioner contributed real estate located at 505-509 North 8th Street (8th Street property) to the Episcopal Diocese, Springfield, Illinois, by a warranty deed dated April 14, 1966. Such property was originally purchased by the petitioner on November 13, 1953, from a Master in Chancery, for $10,000. The property consisted of 2 adjacent lots located on the corner of 8th and Ohio. On the corner lot, 505 North 8th Street, there was a *243 4 2-story frame residence, approximately 50 years old and in a poor state of repair.It contained 3 rooms and a half bath downstairs, 3 rooms and a bath upstairs, and a full basement. It was heated by a coal-fired furnace. Although the house had previously been rented to 2 families, no rent was collected in 1966. Shortly after the property was transferred to the diocese, the frame house was torn down. On the second lot, 509 North 8th Street, there was a 2-family brick home, approximately 50 years old in 1966 and in a good state of repair. The first-floor apartment consisted of 5 rooms and a bath, while the second-floor apartment consisted of 6 rooms and a bath. The walls in the entire house were plastered, the floors were pine with linoleum covering, there was a full concrete basement, a stone foundation, and a shingle roof. The heat was provided by two hot-water furnaces. The total monthly rent for both apartments in the house was $130, and the petitioner collected 3 months' rent prior to the transfer to the diocese in April. Both parcels of land comprising the 8th Street property had been transferred by the petitioner in 1964 in a bond for deed transaction, similar to *244 a conditional sales contract, but were repossessed in 1966. The selling price in 1964 was $13,000. 5 By a warranty deed dated December 21, 1966, the petitioner also conveyed property located at 637 North 9th Street (9th Street property) to the Episcopal Diocese, Springfield, Illinois. He originally purchased this property on June 10, 1965, for $1,844.61. In 1966, a 2-story frame house, approximately 50 years old, was located on the premises. The house, which was in fair condition when occupied in January 1966, was in poor condition by the following December. The tenant moved out in January, and the house remained vacant for the rest of the year. It was located in a deteriorating neighborhood, beset by racial strife. Soon after the property was vacated, a large hole was carved in the front of the house; by March, the petitioner allowed his insurance on the property to lapse; and by December, the windows were broken, the doors removed, and a wall knocked out. During this period, the petitioner was afraid to venture into the neighborhood, or send in his maintenance men, because of threats to their lives, and therefore was unable to maintain the property. The petitioner *245 donated property located at 2411 Kansas Avenue (Kansas Avenue property) to the New Hope Baptist Church by a quitclaim deed dated June 23, 1966. He originally purchased this property on April 25, 1960, for approximately $1,500, which included the purchase 6 price, payment of back taxes, and cost of repair. Located on the property was a 7-room, single-story, frame house, approximately 40 years old, and in a fair state of repair. The house had no furnace; instead, there were gas-fired space heaters. The property was occupied and brought in a monthly rental of $50. The property located at 1628 Division Avenue (Division Avenue property) was also donated to the New Hope Baptist Church by the petitioner in August 1966. He originally purchased this property on April 10, 1956, for $2,816.82. In 1966, a 5-room house made of concrete block, approximately 30 years old, was situated on the property. Heat was supplied by a hand-fired coal furnace, and the house was in need of both exterior and interior repair. However, the property was continuously occupied and brought in a monthly rental of $55.00. The last parcel of land contributed by the petitioner in 1966 was 9.15 acres of industrial *246 property, conveyed to the Greater East St. Louis Humane Society. It was located in the southern East St. Louis industrial section and was zoned for heavy manufacturing and industrial use. It was situated within a 1-mile radius of the Monsanto Chemical Company plant, the American Zinc plant, and the Socony Oil Company refinery. The petitioner purchased the property on April 16, 1962, from an estate for $3,000. It 7 was a tract of unimproved land approximately 500 feet in width and 800 feet, more or less, in length, lying at the end of Falling Springs Avenue, a blacktopped street, but the closest heavily traveled, hard-surface road, Highway No. 3, was approximately 700 feet away. There were railroads running along two sides of the property, but it would have been necessary to construct rail spurs on the property in order to have access to such railroads. The property had neither riparian rights nor sewers, although a sewer line was available within 1200 feet. Shanties were located on or near the property. After holding the property for approximately 1 year, the Humane Society listed it with a realtor for sale for $20,000, but after 6 months, the listing was withdrawn. There *247 were no offers to purchase the property at that price. On his Federal income tax return for 1966, the petitioner claimed a charitable deduction for the value of the contributed property and also for cash. A receipt for the playground fencing and five independent appraisals made at or near the time of the contributions of real estate were attached to the return. The petitioner claimed total charitable contributions of $92,121.40, of which only $29,292.74 could be deducted in 1966. He, therefore, carried $62,853.66 over to 1967, to be used as a deduction in that year. 8 Upon examination of the petitioners' 1966 return, the respondent determined that the fair market value of the property contributed was less than claimed by the petitioner. The differences are set forth in the following table: Property
Value Claimed by Petitioner
Value Determined by Respondent
Cost of playground fencing
$ 932.00
$ 732.00
8th Street property
18,500.00
14,000.00
9th Street property
7,500.00
3,700.00
Kansas Avenue property
4,500.00
2,700.00
Division Avenue property
4,500.00
3,400.00
Industrial property
54,900.00
3,200.00
Total property contributions
$90,832.00
$27,732.00
Cash contributions
1,289.40
1,314.40
Total contributions
$92,121.40
$29,046.40
*248 Accordingly, the respondent determined a deficiency of $123.18 in the petitioners' 1966 income tax, and because there was no carryover, $8,014.20 in the petitioners' 1967 income tax. OPINION We must decide the amount deductible by the petitioner as a result of his paying for the cost of the fence, and the value of the properties contributed to the charities. 9 The petitioner argues that he contributed a fence to the diocese and that the value of such contribution was equal to its retail price, with no adjustment for discount. See Rev. Rul. 69-514, 1969-2 C.B. 36. He analogizes the present situation to that of a gift of a painting or antique in which the amount of the deduction is based upon the value of the contributed property, not its cost. In effect, he contends that the value of his contribution is measured by the retail price of the fence. Sec. 1.170-1(c) (1), Income Tax Regs.
We reject the petitioner's contention. Where a taxpayer purchased property at a discount upon condition that he donate such property to a specific charity, a restriction has been placed on the marketability of the goods in his hands, and because of the restriction, the fair market *249 value is considered to be the actual purchase price. Jacob J. Cooley, 33 T.C. 223 (1959), affd. per curiam 283 F. 2d 945 (C.A. 2, 1960). A similar restriction is placed on the use of property where a taxpayer pledges to pay for such property after it has been purchased by a charity. In the circumstances before us, the petitioner could not have sold the fence. Therefore, neither the retail price of similar fences, nor the price of such fences in the lowest usual market, accurately measures 10 value. Thus, the petitioner may not deduct more than $732, the amount of his actual expenditure. The appraisals of the residential properties which were attached to the petitioners' return for 1966 to support their claimed deductions with respect to such properties were prepared by Bert F. Wuerz, who also testified at the trial with respect to such valuations. Mr. Wuerz was a real estate broker with experience in valuing property. In his reports, he stated that his valuations were based upon comparable sale, but neither in the written reports nor in his testimony did he provide any information as to the comparable sales that he considered. The lack of such *250 information considerably reduces the weight to be given to such appraisals. Cf. Helen D. Emmet, 11 T.C. 90, 95 (1948); 10 Mertens, Law of Federal Income Taxation, sec. 59.03, p. 12 (1970). The respondent had the residential properties appraised by William J. Thebus, who is a qualified appraiser of such properties. He testified and submitted written reports setting forth the bases for his conclusions. Mr. Wuerz determined the value of the 8th Street property to be $18,500; Mr. Thebus concluded that the value of such property did not exceed $14,000. By use of the capitalization of income method, he found that the value of each lot was approximately $7,000, and he 11 found that such a value for each lot was in line with comparable sales. After examining his report and testimony, we believe that he used too large an amount as the cost of insurance and therefore undervalued the lot at 509 North 8th Street. On the other hand, he overstated the value of the lot at 505 North 8th Street, because that house was in such poor condition that it could not be income-producing; in fact, such house was razed shortly after the property was contributed to the diocese. Therefore, *251 we have made appropriate adjustments in the computations made by Mr. Thebus, and have considered the evidence as to comparable sales. Accordingly, we find that the value of the 8th Street property did not exceed $14,000 at the time of its contribution. The 9th Street property was determined by Mr. Wuerz to have a value of $7,500, but such value is substantially in excess of the price at which comparable sales were made. Mr. Thebus capitalized the earnings and determined that the value of such property was approximately $3,700. However, the property was not rented after the first month of the year. Soon after such vacancy commenced, the damage done to the house as a result of vandalism was extensive, and the owner was unable to keep the property in repair. Accordingly, it was inappropriate to use the capitalization of income method to determine the value of 12 such property. However, data as to comparable sales indicates a value in the neighborhood of $3,700. Therefore, we find that the value of the 9th Street property did not exceed $3,700 in 1966. The Kansas Avenue property was rented in 1966, and therefore, the capitalization of income should be taken into consideration *252 in determining its value. By use of that method, Mr. Thebus found the value of that property to be $2,700, but in his computations, he again overstated the cost of insurance. When an appropriate adjustment is made in his computations, the use of the capitalization method for valuation results in a value of approximately $3,200. Such a value appears to be in line with comparable sales, which ranged from $2,700 to $3,400. Consequently, we are convinced that Mr. Wuerz" value of $4,500 for the property was excessive, and we find that the value of the Kansas Avenue property was $3,200 in 1966. The Division Avenue property was also rented, and therefore, its value can be determined by use of the capitalization of income method. Mr. Thebus found the value of such property to be $3,400, but when his error in the cost of insurance is corrected, the property has a value of $3,900 based on the capitalization of income. One 13 other comparable sale was made at a price of $2,700, and 3 comparable sales were made at a price of $4,000 each. Based on this evidence, we believe that Mr. Wuerz" valuation of $4,500 was too high, and we find that the value of the Division Avenue property was *253 $3,900 in 1966. The valuation of the industrial property presents the greatest difficulty. The petitioner called 4 expert witnesses who valued the property on the basis of comparable sales. Their opinion as to the value of the property ranged from $45,750 to $54,900. On the other hand, Mr. Thebus, who appraised such property for the respondent, was of the opinion that there were no comparable sales, and he found the value of the property to be $3,200. In our opinion, the evidence of value of the property based upon comparable sales must be given considerable weight. However, none of the comparable properties was identical, and substantial adjustments should have been made to take account of the differences. For example, the industrial property had neither sewers nor riparian rights, whereas, four of the comparable properties had either one or both. Although the industrial property had railroads nearby, as did at least two of the comparable properties, the feasibility of actual access to such railroads was doubtful because of the expense 14 involved in bringing in a spur. Many of the comparable properties were purchased by owners of adjoining properties or by those to *254 whom the land had unique value. However, there is no indication that the owners of the adjoining properties were interested in acquiring the industrial property owned by the petitioner, nor is there any indication that it had any unique value for anyone else. Additionally, the property at issue was substantially smaller than many of the comparable properties, indicating that the range of possible uses was more limited. It appears that the petitioner's expert witnesses failed to make adequate adjustments for these differences. Accordingly, although we believe that such testimony should be given considerable weight, we believe that it does not support as high a value as determined by such experts. We also believe that the evidence as to the amount paid for the property by the petitioner in 1962, $3,000, should be considered. It is true that the purchase occurred 4 years prior to the time for which we must determine a value; nevertheless, the amount then paid for the property constitutes some evidence of its value. It is also true that the petitioner may have made a fortunate purchase and may have purchased the property for less 15 than its value; yet, it seems unlikely that *255 he could purchase for $3,000 property worth $50,000. Likewise, we believe that the subsequent failure of the Humane Society to sell the property for $20,000 is relevant evidence as to its value. We recognize that there is a limited demand for property of this type, and it may take some time to find a purchaser who needs such property; yet, it seems that if the property were in fact worth approximately $50,000, some alert investor would have seized the opportunity to purchase it for $20,000. Therefore, taking all relevant factors into consideration, we find a fair market value of $27,450, or $3,000 per acre, is reasonable. Decision will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954. ↩